**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**UNITED STATES OF AMERICA,**

**v.**                                                       **Criminal Case No. 3:26cr28**

**JACOREY DAQUAN JIGGETTS,**

    **Defendant.**

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Jacorey Daquan Jiggetts' Motion to Suppress (the "Motion to Suppress" or "Motion"). (ECF No. 20.)[1]   In the Motion, Mr. Jiggetts moved to suppress "all evidence obtained as a result of the searches conducted on July 2, 2025, of (1) 1120 N. 21st Street, Richmond, Virginia 23223 and (2) 5925 Laurel Bed Lane, Unit B, Henrico, Virginia 23227" as the fruit of unconstitutional searches under the Fourth Amendment to the United States Constitution.  (ECF No. 20, at 1.)

On April 9, 2026, Mr. Jiggetts filed the Motion.  (ECF No. 20.)  The United States responded, (ECF No. 22), and Mr. Jiggetts replied, (ECF No. 25).  On May 20, 2026, the Court held a hearing concerning Mr. Jiggetts' Motion.  (ECF No. 33.)  On June 18, 2026, the Court entered an Order denying the Motion.  (ECF No. 36.)

The Court now enters this Memorandum Opinion articulating its reasons for its denial of the Motion to Suppress.  For the reasons articulated below, the Court did not suppress the evidence because the warrants underlying the searches were supported by probable cause and because the good-faith exception to the exclusionary rule applies.

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system.

## I. Factual and Procedural Background

### A.       Factual Findings[2]

On July 1, 2025, Detective Gregory Helfrecht[3] of the Richmond Police Department provided two identical affidavits to judges in the Richmond City Circuit Court and the Henrico Circuit Court in support of searches of 1120 North 21st Street, Richmond, Virginia 23223 ("1120 North 21st Street") and 5925 Laurel Bed Lane, Unit B, Henrico, Virginia 23227 ("5925 Laurel Bed Lane").[4] (ECF No. 20-1, at 1–26 (capturing affidavit and resultant warrant for search of 1120 North 21st Street), 27–51 (capturing affidavit and resultant warrant for search of 5925 Laurel Bed Lane).) Because Mr. Jiggetts challenged the extent to which these affidavits established a basis for the searches of the two properties, the Court summarizes the contents of the affidavits below.

---

[2] Mr. Jiggetts' Motion concerned the propriety of the affidavits used to secure the warrants that resulted in the searches of the two properties. Both parties attach these affidavits and the warrants to their briefing. (*See* ECF Nos. 20-1, 22-1, 22-2.) During the May 20, 2026 motions hearing, neither party offered any other evidence or testimony relevant to the Motion. Accordingly, the Court bases its factual determinations on the contents of the affidavits. Neither party contested the accuracy or authenticity of these affidavits. Because Mr. Jiggetts bore the burden of proof, the Court cites to the affidavits and warrants accompanying his Motion. (ECF No. 20-1.) Moreover, because the affidavits for each of the two locations searched are identical, the Court cites only to one.

[3] Detective Helfrecht described in the affidavits his extensive experience. He "ha[d] been a Richmond Police Officer for over 10 years and [was then] assigned as a Detective with the Special Investigations Division and a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA)." (ECF No. 20-1, at 22.) Detective Helfrecht described his significant experience in narcotics investigations, his "training to include the search warrant process and the use of informants," and his "familiar[ity] with the methods of the drug trade." (ECF No. 20-1, at 22.)

[4] The officers searched, and Mr. Jiggetts' Motion pertains only to, Unit B of 5925 Laurel Bed Lane. For the sake of brevity and ease of readership, the Court refers to this property only as "5925 Laurel Bed Lane."

2

1.      **Detective Helfrecht Begins an Investigation of Mr. Jiggetts By Relying on Information from a Confidential Source**

In May 2025, Detective Helfrecht "began a narcotics investigation on [Mr. Jiggetts]." (ECF No. 20-1, at 9.)  A confidential source (the "CS") provided Detective Helfrecht "information . . . that a subject who [the CS] knew as 'Midtown' was trafficking narcotics . . . within the City of Richmond and the surrounding area." (ECF No. 20-1, at 9–10.)  Detective Helfrecht affirmed that he "considered to be reliable" "[a]ny and all subjects referred to as confidential source(s) . . . based on the information that ha[d] been proven to be accurate through independent police investigation, Department of Motor Vehicle records (DMV), police records and police surveillance." (ECF No. 20-1, at 26.)  The CS had also "provided information on individual(s) involved in narcotics trafficking to include house(s) and locations where drugs are distributed within the Richmond City area" and conducted controlled buys.  (ECF No. 20-1, at 26.)  Moreover, the CS "[was] familiar with the appearance of illegal narcotics as well as how [they are] packaged and distributed" and "ha[d] provided information that ha[d] led to the identification of subject(s) involved in the drug trade." (ECF No. 20-1, at 26.)  The CS' "knowledge and working relationship within the street level drug trade ha[d] led to controlled purchase(s) and suspect identifications." (ECF No. 20-1, at 26.)

The CS "provided a telephone number of 804-398-2084 for 'Midtown.'" (ECF No. 20-1, at 10.)  Detective Helfrecht had the CS contact "Midtown" using this phone number and "arrange[] to purchase a quantity of cocaine.  After the arrangement[,] the CS was equipped with a video and audio recording device." (ECF No. 20-1, at 10.)  Detective Helfrecht then observed the CS "provide[] 'Midtown' with departmental funds in exchange for a quantity of cocaine." (ECF No. 20-1, at 10.)  "The CS was searched prior to and after the transaction.  No contraband was found." (ECF No. 20-1, at 10.)

3

**2.    Based on Information Gathered Through the Confidential Source, Detective Helfrecht Observes that Mr. Jiggetts Consistently Appears at 1120 North 21st Street and at 5925 Laurel Bed Lane**

After the controlled purchase concluded, Detective Helfrecht and other investigators "surveilled [Midtown] back to 1120 N[orth] 21st St[reet]." (ECF No. 20-1, at 10.)  The investigators conducted "[q]ueries" on the 2013 Nissan SUV "Midtown" drove and determined its owner.[5]  (ECF No. 20-1, at 10.)  The investigators conducted further "[q]ueries" on 1120 North 21st Street itself "through various law enforcement databases" and determined that "a Jacorey Jiggetts . . . also resides at 1120 N[orth] 21st St[reet]." (ECF No. 20-1, at 10–11.)

Detective Helfrecht obtained a photograph of Mr. Jiggetts from the Department of Motor Vehicles ("DMV") and ran his criminal history, discovering that Mr. Jiggetts "ha[d] been arrested multiple times in the past for narcotic related offenses." (ECF No. 20-1, at 11.) Detective Helfrecht compared the DMV photograph of Mr. Jiggetts to images taken during the CS' controlled buy with "Midtown."  In doing so, Detective Helfrecht "positively identified" Mr. Jiggetts as "Midtown" and as "the subject who distributed cocaine to the CS." (ECF No. 20-1, at 11.)  Detective Helfrecht conducted an additional "Computerized Criminal History Check," which indicated that Mr. Jiggetts had been arrested numerous times for "a multitude of narcotics and firearm related offenses," that Mr. Jiggetts was "a ten (10) time convicted felon for Possession of a Schedule I/II," and that Mr. Jiggetts had at least one conviction for "Possession of a Firearm by a Convicted Felon." (ECF No. 20-1, at 11.)

In June 2025, Detective Helfrecht obtained and executed a search warrant "for the Real Time Location Data (RTLD) associated with [Mr. Jiggetts'] cellular phone (804-398-2084)." (ECF No. 20-1, at 12.)  In the same month, Detective Helfrecht had the CS conduct a second

---

[5] The affidavits redact the name of the owner of this vehicle.  (ECF No. 20-1, at 10.)

4

controlled buy from Mr. Jiggetts, arranging the meeting using the same phone number. (ECF No. 20-1, at 12.) Detective Helfrecht observed the CS "provide[] [Mr. Jiggetts] with departmental funds in exchange for a quantity of cocaine." (ECF No. 20-1, at 12.) "The CS was searched prior to and after the transaction. No contraband was found." (ECF No. 20-1, at 12.) Detective Helfrecht reviewed the RTLD from Mr. Jiggetts' phone before and after this second controlled buy and determined that his phone "arrived [in] the area of 1120 N[orth] 21st . . . prior to the controlled purchase . . . [then] beg[an] to travel in a direction toward the [arranged] meet location." (ECF No. 20-1, at 12.) "Based on the totality of circumstances and the review of the cellular data," Detective Helfrecht affirmed that he was "confident that the RTLD from [Mr. Jiggetts'] phone [was] an accurate representation of his physical movements during the time period prior to and during the controlled purchase." (ECF No. 20-1, at 12–13.) Detective Helfrecht's continued review of the RTLD allowed him "to determine with a high degree of confidence that [Mr. Jiggetts] was residing in the area of the 5900 Block of Laurel Bed Lane Henrico[,] Virginia." (ECF No. 20-1, at 13.)

On June 13, 2025, Detective Helfrecht conducted a "spot check . . . in the area of 5900 Block of Laurel Bed Lane." (ECF No. 20-1, at 13.) Detective Helfrecht "observed the Nissan SUV bearing Virginia registration UKB-2651 parked in front of 5925 Laurel Bed Lane Unit B," which Detective Helfrecht previously observed Mr. Jiggetts driving during the second controlled buy. (ECF No. 20-1, at 12, 13.) Detective Helfrecht "observed an unknown black male exit 5925 Laurel Bed Lane Unit B[,] approach the parked Nissan SUV[,] go[] into the rear cargo compartment, . . . [and] return[] to 5925 Laurel Bed Lane Unit B." (ECF No. 20-1, at 13.)

5

### 3.    Based on his Observations of Both Premises, Detective Helfrecht Investigates Mr. Jiggetts' Appearances at 1120 North 21st Street

Based on these observations, Detective Helfrecht "set up physical surveillance of [Mr. Jiggetts]." (ECF No. 20-1, at 14.) "At one point during the surveillance, [Mr. Jiggetts] remained stationary at a location. While at that location and based on the training and experience of [Detective Helfrecht], [Mr. Jiggetts] appeared to conduct no less than two (2) street level narcotics transactions." (ECF No. 20-1, at 14.)

Detective Helfrecht also "utilized digital electronic surveillance to observe" 1120 North 21st Street. (ECF No. 20-1, at 14.) Through this surveillance and by examining the RTLD from Mr. Jiggetts' phone, Detective Helfrecht "observed [Mr. Jiggetts] consistently coming and going from" 1120 North 21st Street in a "consistent pattern": "[Mr. Jiggetts] would typically leave the area of 5925 Laurel Bed Lane Unit B . . . and then head to the area of 1120 N[orth] 21[st] St[reet]." (ECF No. 20-1, at 14.)

On June 17, 2025, Detective Helfrecht observed additional activity at 1120 North 21st Street. That day, Mr. Jiggetts "pull[ed] up to and then park[ed] in front of the residence," at which point "an unknown black male . . . arriv[ed]" and "g[ot] into the front passenger seat of [Mr. Jiggetts'] vehicle." (ECF No. 20-1, at 14.) This unknown black male arrived "empty handed," but after a "couple moments" the "unknown male . . . exit[ed] [Mr. Jiggetts'] vehicle . . . in possession of a weighted down black grocery type bag." (ECF No. 20-1, at 15.) Detective Helfrecht observed Mr. Jiggetts leave 1120 North 21st Street and return driving a different vehicle, which, "[b]ased on [Detective Helfrecht's] training and experience," appeared to be "a common counter surveillance technique utilized by narcotics distributors/traffickers to avoid law enforcement detection." (ECF No. 20-1, at 15.)

6

"Between June 19, 2025 and June 25, 2025," Detective Helfrecht had the CS arrange a third controlled buy with Mr. Jiggetts. (ECF No. 20-1, at 15–16.) Detective Helfrecht observed the CS "provide[] [Mr. Jiggetts] with departmental funds in exchange for a quantity of cocaine." (ECF No. 20-1, at 16.) "The CS was searched prior to and after the transaction. No contraband was found." (ECF No. 20-1, at 16.) The investigators observed Mr. Jiggetts at 1120 North 21st Street prior to the controlled buy. (ECF No. 20-1, at 16.)

On June 20, 2025, the investigators observed the same unknown Black male who arrived at 1120 North 21st Street on June 17, 2025 return to the same property. Both Mr. Jiggetts and the unknown Black male entered the residence, then returned to their vehicles. The unknown male "exit[ed] his vehicle again, though this time with a black shoulder bag. The male then . . . g[ot] into the front passenger seat of [Mr. Jiggetts'] vehicle," then exited it "still in possession of the bag," although the bag "appear[ed] to be weighted down as if something was now in it." (ECF No. 20-1, at 16–17.) Detective Helfrecht affirmed that these actions were "consistent with a street level narcotics transaction based on [his] training and experience." (ECF No. 20-1, at 17.)

**4. Based on Other Observations of Both Premises, Detective Helfrecht Concludes that Mr. Jiggetts Resides at 5925 Laurel Bed Lane and Utilizes 1120 North 21st Street as a Stash House**

Throughout this surveillance, "only two primary subjects were observed coming and going" from 1120 North 21st Street, namely Mr. Jiggetts and an unnamed Black female.[6] (ECF No. 20-1, at 17–18.) Detective Helfrecht therefore affirmed that 1120 North 21st Street "d[id] not appear to be resided in" but rather "[was] being utilized to either facilitate the distribution of narcotics or store narcotics." (ECF No. 20-1, at 18.) Detective Helfrecht based this conclusion

---

[6] The affidavits redact this individual's name. (ECF No. 20-1, at 18.)

on Mr. Jiggetts' "actions when at the residence," which suggested that "the [1120 North 21st Street] residence [was] being used as a 'stash' house or a location used to store narcotics, firearms, and/or currency." (ECF No. 20-1, at 18.)

On June 21, 2025, and June 27, 2025, Detective Helfrecht observed that several of the vehicles driven by Mr. Jiggetts were parked at 5925 Laurel Bed Lane. (ECF No. 20-1, at 18.) Based on Mr. Jiggetts' "consistent" pattern, Detective Helfrecht affirmed that Mr. Jiggetts "appear[ed] to consistently be residing at 5925 Laurel Bed Lane." (ECF No. 20-1, at 18.) Based on these facts, Detective Helfrecht affirmed that "there [was] probable cause to believe that further evidence of narcotics trafficking w[ould] be recovered from inside 1120 N[orth] 21st [Street] . . . and 5925 Laurel Bed Lane." (ECF No. 20-1, at 19.)

### 5. Officers Execute the Warrants and Search 1120 North 21st Street and 5925 Laurel Bed Lane

On July 1, 2025, relying on these observations and affirmations, Detective Helfrecht applied for and obtained search warrants for both 1120 North 21st Street and 5925 Laurel Bed Lane from judges in the Richmond City Circuit Court and the Henrico Circuit Court. (ECF No. 20-1, at 4–8 (capturing search warrant for 1120 North 21st Street), 29–33 (capturing search warrant for 5925 Laurel Bed Lane).) On July 2, 2025, officers of the Richmond Police Department executed the two warrants and searched 1120 North 21st Street and 5925 Laurel Bed Lane. (ECF No. 20-1, at 4–8, 29–33 (capturing warrants executed for each location).) The officers recovered from 1120 North 21st Street cocaine, fentanyl, digital scales, packaging materials, a "blender [with] residue," "misc[ellaneous] documents," an "ID card/DL permit," and a cell phone. (ECF No. 20-1, at 5.) The officers recovered from 5925 Laurel Bed Lane, among other items, currency, "multiple firearms," marijuana, "Schedule I or II," packaging materials, and ammunition. (ECF No. 20-1, at 30.)

8

B.    **Procedural Background**

On March 3, 2026, a Grand Jury for the Eastern District of Virginia returned a two-count Indictment charging Mr. Jiggetts with Possession with Intent to Distribute Controlled Substances in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and (C); and Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1.) The same day, an arrest warrant was issued. (ECF No. 4.) On March 23, 2026, Mr. Jiggetts was arrested. (ECF No. 5.) Also on March 23, 2026, Mr. Jiggetts appeared before United States Magistrate Judge Mark R. Colombell for an initial appearance. (ECF No. 6.) On March 26, 2026, he appeared before Magistrate Judge Colombell again for a detention hearing and was detained. (ECF No. 17.) That same day, Mr. Jiggetts appeared before this Court for an arraignment during which a jury trial was scheduled. (ECF No. 12.)

On April 9, 2026, Mr. Jiggetts filed the instant Motion to Suppress. (ECF No. 20). The United States responded, (ECF No. 22), and Mr. Jiggetts replied, (ECF No. 25). On May 20, 2026, the Court held a hearing on the Motion. (ECF No. 33.) On June 18, 2026, the Court issued an Order denying the Motion. (ECF No. 36.) The Court articulates its reasons for its denial of the Motion to Suppress below.

In his Motion and reply, Mr. Jiggetts contended that "neither the Affidavit[s] nor the Government's discovery in this case contains the results of forensic testing of the controlled buy substances, and at no point do[] the Affidavit[s] state that the 'narcotics' recovered in any controlled purchase were in fact unconfirmed or unauthenticated." (ECF No. 20, at 2; ECF No. 25, at 1–2.) During the May 20, 2026 motions hearing, counsel for Mr. Jiggetts stated that, after the Motion was filed, the United States "provided *Giglio* materials and labs" that undermined "the factual predicate for the argument [Mr. Jiggetts] had advanced regarding the unknown

9

nature, uncorroborated nature of the controlled buy substances." (ECF No. 35, at 2:23–3:5.) As a result, Mr. Jiggetts withdrew his argument concerning the authentication of the cocaine recovered during the controlled buys. (ECF No. 35, at 2:23–3:6.) The Court therefore did not consider Mr. Jiggetts' argument with respect to the authenticity of the cocaine in its decision to deny the Motion.

In his briefing, Mr. Jiggetts asserted that the affidavits in support of the search warrants failed to establish a nexus between the alleged criminal activity and the properties searched. (ECF No. 20, at 2; ECF No. 25, at 2–3.) At the May 20, 2026 motions hearing, Mr. Jiggetts' counsel clarified that, based on the lack of evidence demonstrating Mr. Jiggetts' residency in 1120 North 21st Street, the Motion challenged only the nexus between the alleged criminal activity and the property at 1120 North 21st Street, not the nexus between that activity and 5925 Laurel Bed Lane. (ECF No. 35, at 43:7–14, 48:7–14.) Mr. Jiggetts challenged the probable cause determination with respect to 5925 Laurel Bed Lane only on the ground that the CS relied upon in the affidavits was unreliable.[7] (ECF No. 35, at 43:7–14.)

Given the withdrawal of challenges brought by Mr. Jiggetts, the Court confined its analysis of Mr. Jiggetts' Motion to his remaining arguments: (1) that the CS whose information supported the affidavits was unreliable and (2) that the affidavits failed to establish a sufficient nexus between the alleged criminal activity and the property at 1120 North 21st Street.

---

[7] On April 9, 2026, Mr. Jiggetts also filed a motion challenging his detention. (ECF No. 19.) Mr. Jiggetts withdrew the challenge to his detention order at the start of the motions hearing. (ECF No. 35, at 3:14–25.)

## II.  Standard of Review

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  "The Warrant Clause of the Fourth Amendment requires that warrants (1) be issued by a neutral and detached magistrate, (2) contain a 'particular description of the place to be searched, and the persons or things to be seized,' and (3) be based 'upon probable cause, supported by Oath or affirmation.'" *United States v. Clyburn*, 24 F.3d 613, 617 (4th Cir. 1994) (internal brackets omitted) (quoting U.S. Const. amend. IV).  Evidence seized pursuant to an invalid warrant is ordinarily suppressed under the exclusionary rule, meaning that the evidence "cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Thomas*, 908 F.3d 68, 72 (4th Cir. 2018) (quotation omitted).

However, the United States Supreme Court "recognized a good faith exception to that rule, under which evidence obtained by an officer who acts in objectively reasonable reliance on a search warrant will not be suppressed, even if the warrant is later deemed invalid." *Id.* (citing *United States v. Leon*, 468 U.S. 897, 922 (1984)).

"The proponent of a motion to suppress has the burden of establishing that his [or her] own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978); *see also United States v. Bowman*, 106 F.4th 293, 300 (4th Cir. 2024) ("[T]he defendant bears the burden of proof on a motion to suppress.").  "[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

11

### III. Analysis

Mr. Jiggetts asked the Court to suppress the fruits of the two searches because the affidavits underlying the search warrants failed to support the judicial officers' probable cause determinations. According to Mr. Jiggetts, the affidavits were fatally hampered by two remaining errors:[8] (1) the affidavits' lack of details about the CS' reliability, (ECF No. 20, at 1), and (2) the affidavits' disclaimer that 1120 North 21st Street was not Mr. Jiggetts' primary residence, (ECF No. 25, at 2–3). The United States responded that (1) the affidavits make clear that the investigators corroborated the CS' reliability; (2) the affidavits establish a nexus between 1120 North 21st Street and Mr. Jiggetts' alleged drug trafficking; and, (3) that, in the alternative, even if the affidavits failed to support probable cause determinations, the good-faith exception to the exclusionary rule would apply. (ECF No. 22, at 5–11.)

The Court denied the Motion for three reasons. First, the affidavits demonstrate that the investigators properly corroborated the information provided by the CS, thereby establishing the CS' reliability. Second, the affidavit underlying the search of 1120 North 21st Street provided ample information to establish a nexus between Mr. Jiggetts' alleged drug trafficking and that property. And third, even if the affidavits did not support probable cause determinations underlying the two searches, the good-faith exception would apply. In sum, the investigators did not rely solely on the tip from the CS, but rather engaged in a fulsome investigation of Mr. Jiggetts, as recounted in the affidavits.

---

[8] As stated earlier, Mr. Jiggetts withdrew an earlier challenge to the authenticity of the drug at issue being cocaine.

### A.    The Affidavits Contain Ample Corroboration of the Information Provided by the CS and Establish the CS' Reliability

Mr. Jiggetts first contended that the warrants were unsupported by probable cause because Detective Helfrecht's affidavits did not describe with particularity whether the CS was reliable. (ECF No. 20, at 1.) The Court concluded otherwise. Detective Helfrecht undertook extensive investigative steps to corroborate and verify the accuracy of the CS' initial tip, thereby establishing the CS' reliability and supporting the judicial officers' probable cause determinations.

### 1.    Legal Standard:  Probable Cause and Reliance on Confidential Informants

After a magistrate judge or state circuit court judge has issued a search warrant, courts will review the decision "with great deference, asking only whether the judicial officer had a substantial basis for finding probable cause." *United States v. Blakeney*, 949 F.3d 851, 859 (4th Cir. 2020) (citations and internal quotation marks omitted).  Such deference, however, "does not mean that warrants based on conclusory allegations should be upheld:  'Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his [or her] action cannot be a mere ratification of the bare conclusions of others.'" *United States v. Wilhelm*, 80 F.3d 116, 119 (4th Cir. 1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)). "When reviewing the probable cause supporting a warrant, a reviewing court must consider only the information presented to the magistrate who issued the warrant." *Wilhelm*, 80 F.3d at 118 (citing *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990)).

Whether the issuing judge had a substantial basis for finding probable cause is reviewed under the totality of the circumstances. *United States v. May*, 446 F. App'x 652, 654 (4th Cir. 2011).  When evaluating whether probable cause exists, the issuing magistrate may consider the

13

reliability of a confidential source. *See United States v. Lalor*, 996 F.2d 1578, 1581 (4th Cir. 1993) ("Corroboration of apparently innocent details of an informant's report tends to indicate that other aspects of the report are also correct.") (citing *Gates*, 462 U.S. at 244). A law enforcement officer's statement that "based on his [or her] training and experience," contraband is likely to be found in a particular residence can also support a finding of probable cause. *See United States v. Williams*, 40 F. App'x 843, 845 (4th Cir. 2002) (citing *Gates*, 462 U.S. at 231–32); *Gates*, 462 U.S. at 231–32 (officers may make deductions, assess probabilities, and draw inferences based on their training and experience). "As always, the ultimate touchstone of the Fourth Amendment is reasonableness." *United States v. Cobb*, 970 F.3d 319, 327 (4th Cir. 2020), as amended (Aug. 17, 2020) (quoting *United States v. Lyles*, 910 F.3d 787, 791 (4th Cir. 2018) (further quotations omitted)).

When an affidavit in support of a search warrant relies upon information provided by a confidential source, the Court's evaluation of the confidential source's reliability is one part of the totality-of-the-circumstances test that informs a probable cause determination. As the United States Court of Appeals for the Fourth Circuit has explained, "[a]n informant's 'veracity' or 'reliability' and his [or her] 'basis of knowledge' are relevant considerations in the totality-of-the-circumstances analysis, but neither consideration is necessary." *United States v. Gondres-Medrano*, 3 F.4th 708, 715 (4th Cir. 2021). Rather, *corroboration* of an informant's tip can "verif[y] the informant's reliability," whether the informant is anonymous or known to an investigating officer. *Id.* at 715–16. The Fourth Circuit has emphasized that an informant with a proven track record of reliability offers inherent "corroboration that his [or her] future tips will likewise be reliable." *Id.* at 716. But a lack of a proven track record is not fatal to an informant's reliability. Even if an informant has "no track record of reliability," an affiant must

14

show "[s]ome corroboration" to demonstrate reliability. *Id.* And even with these reliability considerations in mind, the Court "still look[s] to the totality of the circumstances." *Id.* (citing *Gates*, 462 U.S. at 230–31).

### 2. The Affidavits Established the CS' Reliability Through Corroboration of the CS' Tip

Mr. Jiggetts contended that "[w]hile the Affidavit[s] . . . purport to establish CS reliability, [they] contain[] only generic boilerplate applicable to any confidential source—no case-specific prior track record, no criminal history, no disclosure of pending charges or compensation, and no corroboration of this CS's past performance." (ECF No. 20, at 1.) Specifically, Mr. Jiggetts asserted that (1) Detective Helfrecht was obligated to provide additional information with respect to the CS' initial tip to the investigators that Mr. Jiggetts was engaged in drug trafficking and (2) Detective Helfrecht's failure to include that additional information at the outset of the affidavits tainted the remainder of the investigative steps described in the affidavits. Both arguments foundered.

Detective Helfrecht amply corroborated the CS' tip throughout the affidavits. Indeed, the investigation involved at least ten instances in which investigators confirmed over time the reliability and accuracy of the CS' information and verified the identity of "Midtown" as Mr. Jiggetts over time:

(1) The CS provided investigators with "Midtown's" phone number, which investigators traced to Mr. Jiggetts. (ECF No. 20-1, at 10, 12.)

(2) Investigators utilized the CS to conduct an initial controlled buy from "Midtown" using the phone number previously provided to arrange the buy. Investigators then followed "Midtown's" Nissan SUV to 1120 North 21st Street. (ECF No. 20-1, at 10.)

(3) Using their training and experience in drug investigations, officers searched law enforcement databases and found that the Nissan SUV was registered to a person later identified to be an associate of "Midtown" and

15

that these databases listed Mr. Jiggetts as residing at 1120 North 21st Street. (ECF No. 20-1, at 10–11.)

(4)     Detective Helfrecht positively identified a photograph of Mr. Jiggetts from DMV records as the person who distributed cocaine to the CS. Detective Helfrecht conducted a criminal history check revealing, among other things, that Mr. Jiggetts had been convicted ten times of felony possession of a controlled substance and had been convicted of possession of a firearm by a convicted felon. (ECF No. 20-1, at 11.)

(5)     Investigators obtained a search warrant for RTLD from the telephone number provided by the CS. (ECF No. 20-1, at 12.)

(6)     A second and third controlled buy of cocaine from Mr. Jiggetts—also using phone location data—demonstrated that he traveled to and from the location of the drug transactions using previously-identified cars, driving between 1120 North 21st Street and 5925 Laurel Bed Lane when conducting the transactions. (ECF No. 20-1, at 12, 15–17.) Investigators observed Mr. Jiggetts entering 1120 North 21st Street with a key on more than one occasion. (ECF No. 20-1, at 15.) Surveillance revealed that traffic into and out of 1120 North 21st Street occurred in conjunction with known drug transactions. (ECF No. 20-1, at 17–18.)

(7)     In addition to cell phone location data, investigators' "spot checks" showed that cars associated with Mr. Jiggetts, including the Nissan SUV and a black Chevrolet sedan, were parked near 5925 Laurel Bed Lane at times consistent with Mr. Jiggetts' living in that location. (ECF No. 20-1, at 13.)

(8)     Surveillance by law enforcement and cell location data showed Mr. Jiggetts traveling to and from 1120 North 21st Street using multiple cars associated with him in a manner consistent with counter surveillance techniques. (ECF No. 20-1, at 18.)

(9)     Surveillance by law enforcement and cell phone location data revealed Mr. Jiggetts engaging in at least two street-level narcotics transactions out of his car. (ECF No. 20-1, at 14.)

(10)    Physical surveillance and cell phone location data—based on the times of his presence and travel patterns—demonstrated that Mr. Jiggetts appeared to reside at 5925 Laurel Bed Lane and to utilize 1120 North 21st Street when coming from and going to narcotics-related activities. (ECF No. 20-1, at 17–18.)

16

This physical evidence observed and these investigative techniques used amply established probable cause in the affidavits challenged at bar.  Mr. Jiggetts' attempts to establish otherwise did not persuade, either factually or under the law.

>    a.    **Detective Helfrecht Was Not Required to Provide Additional Information as to the CS' Background Beyond the Extensive Corroboration of the Provided Information Delineated in the Affidavit**

During the May 20, 2026 motions hearing, Mr. Jiggetts contended that Detective Helfrecht was obligated to provide additional information with respect to the CS' tip at the beginning of the affidavits: "The affidavit[s] [didn't] indicate whether [the CS' tip] was firsthand knowledge observed by the [CS]," (ECF No. 35, at 39:16–18), nor did they contain any "case-specific prior track record, [] criminal history, [] disclosure of pending charges or compensation, [or] corroboration of this CS's past performance." (ECF No. 20, at 1.)

But Mr. Jiggetts cited no caselaw that *requires* an officer to describe in greater detail the added information about the informant's background to determine whether the informant is reliable.  Rather, the Fourth Circuit has made clear that when confronted with a potentially unreliable informant, an officer seeking a search warrant must demonstrate *corroboration* of the source's information.  Indeed, corroboration can support an informant's reliability even where that informant has "no track record of reliability." *Gondres-Medrano*, 3 F.4th at 716; *see also United States v. Clyburn*, 24 F.3d 613, 617–18 (4th Cir. 1994) (concluding that while an officer's affidavit contained a "barebones" assertion that informant was reliable, affiant's testimony before the judicial officer supported a probable cause determination because it "established that the informant had . . . personally made a controlled purchase of crack cocaine at that house only the day before").

Detective Helfrecht had no obligation to provide further information concerning the CS' background[9] or the contents of the tip because the extensive investigation described in the affidavits thoroughly confirmed the veracity of the information provided by the CS.

### b.      Detective Helfrecht's Affidavits Provided Abundant Corroboration of the CS' Tip

As the United States correctly observed during the May 20, 2026 hearing, the tip from the CS "was the starting point, not the ending point" of the investigation of Mr. Jiggetts. (ECF No. 35, at 50:20–21.)  The affidavits at bar contain abundant corroboration of the CS' tip.  Detective Helfrecht's sworn statement in the affidavits confirmed and amplified the information provided by the CS.  Detective Helfrecht and the investigators properly corroborated the CS' initial tip that "Midtown," later revealed to be Mr. Jiggetts, "was trafficking narcotics to whit cocaine within the City of Richmond and the surrounding area." (ECF No. 20-1, at 10.)  Using Mr. Jiggetts' phone number as provided by the CS, Detective Helfrecht organized three controlled purchases of cocaine through Mr. Jiggetts by the CS.[10]

---

[9] As discussed below, Detective Helfrecht had the CS conduct three controlled buys from Mr. Jiggetts.  The affidavits indicate that the CS "provided information on individual(s) involved in narcotics trafficking" and "made controlled purchase(s) of narcotics." (ECF No. 20-1, at 26.) But the affidavits do not state whether the CS provided this information or performed the controlled purchases in separate investigations unrelated to Mr. Jiggetts, or whether the CS provided this information and the conducted controlled buys as part of Detective Helfrecht's investigation of Mr. Jiggetts.  This did not alter the Court's conclusions.

[10] These controlled purchases alone could support the judicial officers' probable cause determinations. *See United States v. Reed*, 788 F. App'x 903, 907 (4th Cir. 2019) ("Although we have cautioned that a controlled buy is not *per se* sufficient to establish probable cause, the controlled buys . . . corroborated the concerned citizen's account of drug distribution.  We therefore conclude that there was probable cause to support the search warrant."); *United States v. Patterson*, 406 F. App'x 773, 783 (4th Cir. 2011) (determining that confidential informant's participation in a controlled buy "not only corroborated the CI's statements regarding her past purchases, but also provided independent grounds on which to base the finding of probable cause") (citing *Clyburn*, 24 F.3d at 618).

18

As identified above, investigators conducted three controlled buys with Mr. Jiggetts, each time gathering additional evidence connecting Mr. Jiggetts to the cars and residential locations ultimately searched. But as described above, the affidavits support findings of probable cause on bases *other than* the controlled purchases.[11] Even were the Court to exclude the controlled buys, the affidavits establish the following bases for probable cause:

(1)    The CS provided investigators with "Midtown's" phone number, which investigators traced to Mr. Jiggetts. (ECF No. 20-1, at 10, 12.)

(2)    Investigators followed "Midtown's" Nissan SUV to 1120 North 21st Street *after* the first controlled buy. (ECF No. 20-1, at 10.)

(3)    Using their training and experience in drug investigations, officers searched law enforcement databases and found that the Nissan SUV was registered to a person later identified to be an associate of "Midtown" and that these databases listed Mr. Jiggetts as residing at 1120 North 21st Street. (ECF No. 20-1, at 10–11.)

(4)    Detective Helfrecht positively identified a photograph of Mr. Jiggetts from DMV records as the person who distributed cocaine to the CS. Detective Helfrecht conducted a criminal history check revealing, among other things, that Mr. Jiggetts had been convicted ten times of felony possession of a controlled substance and had been convicted of possession of a firearm by a convicted felon. (ECF No. 20-1, at 11.)

(5)    Investigators obtained a search warrant for RTLD from the telephone number provided by the CS. (ECF No. 20-1, at 12.)

(6)    The RTLD demonstrated that Mr. Jiggetts traveled to and from the location of the drug transactions using previously-identified cars, driving between 1120 North 21st Street and 5925 Laurel Bed Lane when conducting the transactions. (ECF No. 20-1, at 12, 15–17.) Investigators observed Mr. Jiggetts entering 1120 North 21st Street with a key on more than one

---

[11] In his reply, Mr. Jiggetts unpersuasively characterized the United States as arguing the "CS['] reliability was established through the controlled buys themselves." (ECF No. 25, at 3.) But the United States did not offer the controlled buys as "the predicate criminal activity." Rather, as the ten instances outlined above demonstrate, the United States aggregated the controlled buys, the actions observed by investigators *after* the controlled buys, and the experience and insight of Detective Helfrecht to support the probable cause determinations underlying the search warrants. (ECF No. 22, at 5–8.) Where Mr. Jiggetts cabined the probable cause analysis, the United States properly accounted for the totality of the circumstances.

occasion. (ECF No. 20-1, at 15.)  Surveillance revealed that traffic into and out of 1120 North 21st Street occurred in conjunction with known drug transactions.  (ECF No. 20-1, at 17–18.)

(7)    In addition to cell phone location data, investigators' "spot checks" showed that cars associated with Mr. Jiggetts, including the Nissan SUV and a black Chevrolet sedan, were parked near 5925 Laurel Bed Lane at times consistent with Mr. Jiggetts' living in that location. (ECF No. 20-1, at 13.)

(8)    Surveillance by law enforcement and cell location data showed Mr. Jiggetts traveling to and from 1120 North 21st Street using multiple cars associated with him in a manner consistent with counter surveillance techniques. (ECF No. 20-1, at 18.)

(9)    Surveillance by law enforcement and cell phone location data revealed Mr. Jiggetts engaging in at least two street-level narcotics transactions out of his car. (ECF No. 20-1, at 14.)

(10)   Physical surveillance and cell phone location data—based on the times of his presence and travel patterns—demonstrated that Mr. Jiggetts appears to reside at 5925 Laurel Bed Lane and to utilize 1120 North 21st Street when coming from and going to narcotics-related activities. (ECF No. 20-1, at 17–18.)

These additional investigative steps constituted corroboration of the CS' initial tip, established the reliability of the CS, and amply supported the judicial officers' ultimate probable cause determinations.

### c.    Mr. Jiggetts Did Not Present Legal Argument that Could Support a Finding that the Affidavits Lacked Probable Cause

In briefing and during the hearing, Mr. Jiggetts relied primarily on *United States v. Garrett*, 141 F.4th 96 (4th Cir. 2025), to note that "[t]he Fourth Circuit recently addressed the importance of independently establishing informant reliability." (ECF No. 25, at 3 (citing *Garrett*, 141 F.4th at 103–04).)  In *Garrett*, a defendant argued that the United States rendered his guilty plea involuntary when the United States failed to disclose material information before the defendant pled guilty to the charge.  The investigator's affidavit concerning Garrett suggested

that only one CS participated in the investigation when, in fact, at least two did. *Garrett*, 141 F.4th at 99. The United States did not disclose all the cooperators involved, preventing the defendant from challenging the reliability of the informants because he lacked knowledge that a second informant existed at all. And the United States did not disclose that the investigators had misidentified some participants in the controlled purchases, including Garrett himself. *Id.* at 106. The *Garrett* court had no trouble concluding that the warrant at issue there "was secured based on the affiant's knowing misrepresentation about a confidential informant's involvement in the case." *Id.* at 106 (citation omitted). The United States' failures to disclose and its misrepresentations rendered Garrett's guilty plea involuntary. *Id.* at 114.

As explicated in detail above, the matter at bar contains nothing like the misrepresentations and omissions extant in the *Garrett* case. Mr. Jiggetts stretched the law too far when suggesting that *Garrett* "teaches . . . that there is a requirement to provide some sort of granular factual basis apart from pure conclusions from the affiant." (ECF No. 35, at 44:21–25.) The affidavits at bar provided the support that the judicial officers needed to determine probable cause to search the residences existed. The affidavits established that investigators (1) connected Mr. Jiggetts to a phone number provided by the CS; (2) arranged for the CS to conduct a controlled buy through Mr. Jiggetts, then followed Mr. Jiggetts to 1120 North 21st Street after the purchase; (3) searched law enforcement databases to connect Mr. Jiggetts to 1120 North 21st Street and the car used during the controlled purchase; (4) positively identified Mr. Jiggetts using his DMV photo and criminal history; (5) obtained and tracked Mr. Jiggetts' RTLD; (6) conducted two more controlled buys through Mr. Jiggetts, then observed him enter 1120 North 21st Street using a key; (7) observed cars associated with Mr. Jiggetts' alleged drug trafficking at 5925 Laurel Bed Lane; (8) observed Mr. Jiggetts traveling to and from 1120 North 21st Street

using multiple vehicles; (9) observed Mr. Jiggetts engaged in street-level narcotics transactions; and, (10) observed Mr. Jiggetts travel between 5925 Laurel Bed Lane and 1120 North 21st Street. When viewing the totality of these circumstances, the Court readily concluded that the affidavits provided the judicial officers with a strong basis for their probable cause determinations.[12]

Accordingly, the Court determined that the affidavits made a sufficient showing of the CS' reliability through corroboration of the initial tip such that the judicial officers had a sufficient basis for their probable cause determinations. The Court therefore denied the Motion with respect to Mr. Jiggetts' arguments about the CS' reliability.

**B.    The Affidavit Established a Nexus Between Mr. Jiggetts' Alleged Drug Trafficking and the Property at 1120 North 21st Street**

Mr. Jiggetts contended that the affidavit underlying the search of 1120 North 21st Street[13] failed to establish a nexus between Mr. Jiggetts' alleged drug trafficking and that property such

---

[12] Mr. Jiggetts also cited *United States v. Johnson* for the proposition that "[w]ithout corroboration of CS reliability . . . the issuing judicial officer is deprived of sufficient facts and . . . circumstances to independently determine probable cause." (ECF No. 20, at 2 (citing 4 F. App'x 169, 172 (4th Cir. 2001)).) But similar to *Johnson* (which involved fifteen wiretaps, controlled buys, and significant investigation), Detective Helfrecht and the investigators invoked a multitude of investigative techniques to confirm the CS' initial information so that the judges who granted the search warrant applications had abundant facts to "determine probable cause." Like *Johnson*, this Court did not have before it a "barebones" affidavit especially given the number of controlled buys presented. *Johnson*, 4 F. App'x at 172.

[13] As discussed above, during the motions hearing, Mr. Jiggetts' counsel clarified that the Motion challenges only the nexus between the alleged criminal activity and 1120 North 21st Street, not the nexus between that activity at 5925 Laurel Bed Lane. (ECF No. 35, at 43:7–14, 48:7–14.) Had Mr. Jiggetts asserted that the affidavits did not establish a sufficient nexus between the alleged criminal activity and 5925 Laurel Bed Lane, the Court would have concluded that the affidavits were supported by probable cause given the totality of the circumstances.

that the judicial officer could not make a valid determination of probable cause.[14] (ECF No. 25, at 2–3.) According to Mr. Jiggetts, the affidavit failed to establish this nexus for two reasons: (1) the property at 1120 North 21st Street was not Mr. Jiggetts' primary residence, but rather a "stash house" containing drugs and (2) because the 1120 North 21st Street property was a stash house, Detective Helfrecht was required to include in the affidavit direct evidence of Mr. Jiggetts engaging in drug-related activity at that property. (ECF No. 25, 2–3; ECF No. 35, at 41:17–43:6.)

Neither argument prevails. That 1120 North 21st Street was not Mr. Jiggetts' primary residence does not change the totality-of-the-circumstances analysis that the Court must use to review the judicial officer's probable cause determination. Applying that totality-of-the-circumstances approach, Detective Helfrecht provided sufficient evidence to support the determination that a search of 1120 North 21st Street would yield evidence of criminality.

### 1. Legal Standard: Nexus Between the Alleged Criminal Conduct, Place to be Searched, and Items to be Seized

For a warrant to be supported by probable cause, a nexus between the alleged criminal conduct, the place to be searched, and the items to be seized must exist. *See United States v. Grossman*, 400 F.3d 212, 217 (4th Cir. 2005). This nexus can exist "even when the affidavit supporting the warrant contains no factual assertions directly linking the items sought" to the place to be searched. *Grossman*, 400 F.3d at 217 (quotation omitted). Simply put, the issuing magistrate judge is permitted to reach a reasonable, common-sense conclusion that evidence is likely to be found in a location based on the "normal inferences" about where evidence may be

---

[14] During the May 20, 2026 hearing, the United States incorrectly argued that Mr. Jiggetts raised his nexus argument for the first time in reply. (ECF No. 35, at 7:1–2.) The record instead shows that the initial motion "put the nexus issue in play." (ECF. No. 35, at 37:25–38:3.)

kept. *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988); *Williams*, 40 F. App'x at 845 (evidence of drug trafficking from the defendant's automobile offered probable cause for a warrant for the defendant's residence); *Grossman*, 400 F.3d at 217–18 (finding sufficient nexus between defendant's suspected drug activity and three residences to which he had access and in which he stayed from time to time, stating that "it is reasonable to suspect that a drug dealer stores drugs in a home to which he owns a key"); *United States v. Williams*, 548 F.3d 311, 319 (4th Cir. 2008) (observing that the Fourth Circuit has consistently "upheld warrants to search suspects' residences and even temporary abodes" where there was "(1) evidence of the suspects' involvement in drug trafficking combined with (2) the reasonable suspicion (whether explicitly articulated by the applying officer or implicitly arrived at by the magistrate judge) that drug traffickers store drug-related evidence in their homes").

In the absence of factual assertions directly linking the items sought to the place to be searched, "probable cause can be inferred from the circumstances." *Lalor*, 996 F.2d at 1582 (citing *Anderson*, 851 F.2d at 729). A warrant is not automatically invalid when it fails to produce "direct evidence that the items to be seized will be found at a particular location." *Id.* (citations omitted); *see Anderson*, 851 F.2d at 729 (finding probable cause to search residence for pistol and silencer attachment even though the affidavit contained no facts that these items were located at the residence); *United States v. Williams*, 974 F.2d 480, 481–82 (4th Cir. 1992) (per curiam) (finding probable cause to search motel room based on reasonable inference by magistrate that "drug paraphernalia would be found in the motel room of a known drug dealer").

Where an affidavit fails to link the relevant criminal conduct to the defendant's residence, the warrant to search the residence is not supported by probable cause. For example, in *Lalor*, the warrant was not supported by probable cause when its accompanying affidavit was "devoid

of any basis from which the magistrate could infer that evidence of drug activity would be found at [the residence]," where the affidavit "[did] not describe circumstances that indicate such evidence was likely to be stored at [defendant's] residence" and did not "explain the geographic relationship between the area where the drug sales occurred and [the residence]." 996 F.2d at 1582–83.

> **2.** **Mr. Jiggetts Could Not Sustain his Assertion that the Standard for Probable Cause to Search a Residence Differs from that of the Search of a Stash House**

Mr. Jiggetts asserted that the Court must alter its analysis of the judicial officers' probable cause determinations depending on the nature of the property searched. Here, the parties did not dispute that the affidavit established that Mr. Jiggetts did not reside at 1120 North 21st Street. (ECF No. 20-1, at 18 (noting that 1120 North 21st Street "did not appear to be resided in" but rather "[was] being utilized to either facilitate the distribution of narcotics or store narcotics").) Instead, Mr. Jiggetts maintained that "there's not the same . . . treatment for a nonresidence property that there would be for a property that is established to be the target's home." (ECF No. 35, at 43:3–6.) Mr. Jiggetts argued that when an affidavit alleges that an individual engages in drug trafficking, a reviewing court may apply a "presumption" that there is a nexus between the individual's primary residence and their drug trafficking. (ECF No. 35, at 42:18–20.) Relatedly, if the affidavit instead alleges that drug trafficking activity took place in or around a stash house, a "stash-house theory requires *direct evidence* connecting the interior of the premises to drug activity." (ECF No. 25, at 2 (emphasis added) (citation omitted).)

In support of this characterization of the law, Mr. Jiggetts relies primarily on *United States v. Williams*, 548 F.3d 311 (4th Cir. 2008) and *United States v. Grossman*, 400 F.3d 212 (4th Cir. 2005). Neither case supports Mr. Jiggetts' proposed residence-versus-stash house distinction in legal standards. Rather, the Court must apply the same totality-of-the-circumstances analysis regardless of whether the warrant seeks to search a residence or a nonresidence.

Rather than establish a bright line rule, the Fourth Circuit recognized in both *Williams* and *Grossman* that "it is reasonable to suspect that a drug dealer stores drugs in a home to which he owns a key." *Williams*, 548 F.3d at 320 (quoting *Grossman*, 400 F.3d at 218). The Fourth Circuit did not establish a *presumption* that, upon discovering a defendant's drug trafficking activity, an investigator obtains probable cause to search the defendant's primary residence. Both *Williams* and *Grossman* relied upon the totality-of-the-circumstances analysis typical of a probable cause determination. *See Williams*, 548 F.3d at 321 ("The[] details of the affidavits *give rise to the common sense inference* that . . . [the suspects] lived in the targeted dwellings.") (emphasis added); *Grossman*, 400 F.3d at 217–18 (acknowledging the "totality of the circumstances" and analyzing the "cumulative effect of the evidence").

Indeed, *Grossman* expressly disallowed any different evidentiary standard for the search of a primary residence and that of a stash house. The Fourth Circuit rejected Grossman's argument that the affidavits underlying a search lacked a sufficient nexus between the crime alleged and the properties searched because the defendant "d[id] not reside in any of the three searched homes." *Id.* at 218. The *Grossman* court explained that it had upheld searches, upon a

26

review of the totality of the circumstances, even where defendants maintained "less an established 'residence'" than the defendant's use of three separate houses. *Id.*[15]

Because courts must examine the totality of the circumstances in analyzing a search of a residence or a nonresidence, an affidavit need not establish "direct evidence" of criminality within a nonresidence. *See United States v. Rodriguez-Preciado*, 476 F. Supp. 3d 341, 352 (E.D. Va. 2020) ("[T]he *totality of these circumstances* sufficiently raises a fair probability that the [drug trafficking organization] was utilizing the residence [searched pursuant to a search warrant] as a stash house.") (emphasis added); *United States v. Dowdell*, 546 F. App'x 128, 133 (4th Cir. 2013) (applying totality-of-the-circumstances approach to search of a building that was both a primary residence and a stash house). A proper nexus between alleged criminal activity and a property to be searched can exist "even when the affidavit supporting the warrant contains *no factual assertions directly linking the items sought*" to the place to be searched. *Grossman*, 400 F.3d at 217 (quotation omitted) (emphasis added).

Accordingly, the Court examined whether the totality of the circumstances asserted in the affidavit provided sufficient support for the search of 1120 North 21st Street. The Court concluded that the affidavit provided sufficient support to establish that nexus.

### 3. Given the Totality of the Circumstances, the Affidavit Established a Nexus Between Mr. Jiggetts' Alleged Drug Trafficking and the Property at 1120 North 21st Street

As the United States correctly argued at the motions hearing, the affidavit established a nexus between the criminal activity observed by the investigators and 1120 North 21st Street.

---

[15] Even if the Court were to read *Grossman* to distinguish between searches of a residence and nonresidence, the Court would be guided by *Grossman's* conclusion that "it is reasonable to suspect that a drug dealer stores drugs in a home to which he [or she] *owns a key*." *Grossman*, 400 F.3d at 218 (emphasis added). The affidavit here clearly established that Mr. Jiggetts possessed a key to 1120 North 21st Street. (ECF No. 20-1, at 15.)

(ECF No. 35, at 53:8–55:8.)  The affidavit asserted, among other facts, that (1) RTLD taken from Mr. Jiggetts' phone placed him at 1120 North 21st Street just prior to a controlled buy, (ECF No. 20-1, at 12); (2) following the same controlled buy, Mr. Jiggetts returned to 1120 North 21st Street, (ECF No. 20-1, at 10); (3) the same vehicle that Mr. Jiggetts drove during the controlled buy was registered to 1120 North 21st Street, (ECF No. 20-1, at 11); (4) law enforcement databases listed Mr. Jiggetts as residing at 1120 North 21st Street; (5) Detective Helfrecht "observed [Mr. Jiggetts] consistently coming and going from" 1120 North 21st Street, (ECF No. 20-1, at 14); and, (6) on June 17, 2025, Detective Helfrecht observed an unknown male arrive at 1120 North 21st Street, enter Mr. Jiggetts' vehicle empty-handed, and leave that vehicle "in possession of a weighted down black grocery type bag," (ECF No. 20-1, at 14–15).

These facts, taken together, sufficiently established a nexus between Mr. Jiggetts' alleged drug trafficking and the property at 1120 North 21st Street.[16]  Accordingly, the Court concluded that, under the totality of the circumstances, probable cause supported the warrant for the search of 1120 North 21st Street.  The Court denied Mr. Jiggetts' Motion with respect to that argument.

> **D.    Were it Required to So Find, the Court Would Conclude that the Investigating Officers Acted in Good-Faith Reliance on the Warrants**

The United States also argued in the alternative that even if the warrants were unsupported by probable cause, the officers executing the warrants acting in good-faith reliance on those warrants.  (ECF No. 22, at 9–11.)  The Court agreed.

---

[16] During the motions hearing, Mr. Jiggetts suggested that the affidavit could not support a search of 1120 North 21st Street because "[t]here's no indication [in the affidavits] that th[e] controlled buy[s] happened at or anywhere near" 1120 North 21st Street.  (ECF No. 35, at 40:4–6.)  But as discussed above, that the affidavit lacks allegations of direct drug trafficking at the premises is not fatal to the judicial officer's probable cause determination.

28

### 1. **Legal Standard: The Good-faith Exception to the Exclusionary Rule**

Even if a warrant is not supported by probable cause, "the evidence obtained will not be suppressed if the executing officer relied on the warrant in objectively reasonable good faith." *United States v. Blakeney*, 949 F.3d 851, 859 (4th Cir. 2020) (citing *United States v. Leon*, 468 U.S. 897, 922–23 (1984)). "[T]he proper test of an officer's good faith is 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" *United States v. Hyppolite*, 65 F.3d 1151, 1156 (4th Cir. 1995) (quoting *Leon*, 468 U.S. at 922 n.23).

In *United States v. Leon*, the Supreme Court "explained that an officer could not be found to have acted with 'objective reasonableness,'" *United States v. Bynum*, 293 F.3d 192, 195 (4th Cir. 2002), thereby barring the application of the good-faith exception, in the following circumstances:

> (1) where the issuing magistrate "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his [or her] reckless disregard of the truth";
>
> (2) "where the issuing magistrate wholly abandoned his [or her] judicial role";
>
> (3) where "a warrant based on an affidavit [is] 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'"; or
>
> (4) where the warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid."

*Leon*, 468 U.S. at 923 (citations omitted)). Additionally, if a defendant successfully demonstrates under *Franks v. Delaware*, 438 U.S. 154 (1978) that an affiant intentionally or recklessly made false statements in or omitted material information from an affidavit in support of a warrant, the good-faith exception does not apply.

29

**2.      Were it to Evaluate this Argument, the Court Would Not Suppress the Fruits of the Searches Because None of the *Leon* Exceptions Were Present**

The United States argued that the good-faith exception to the exclusionary rule would apply because the arresting officers reasonably relied on the warrants to search the two locations. In briefing, Mr. Jiggetts noted that the good-faith exception does not apply when a defendant makes a successful challenge under *Franks v. Delaware*, 438 U.S. 154 (1978). Before he withdrew his challenge to the authenticity of the cocaine obtained during the controlled buys, Mr. Jiggetts contended in his briefing that Detective Helfrecht omitted material information about the authenticity of the cocaine from the affidavits in violation of *Franks*. (*See* ECF No. 20, at 1–2; ECF No. 25, at 3–4.) As a result, Mr. Jiggetts insisted that the good-faith exception did not apply here. (ECF No. 25, at 3–4.) But during the motions hearing, Mr. Jiggetts withdrew both his argument with respect to the authenticity of the cocaine *and* his *Franks* argument. (ECF No. 35, at 48:15–49:9.) The Court therefore did not consider Mr. Jiggetts' *Franks* argument.

Mr. Jiggetts contended that "even absent a *Franks* violation, *Leon* identifies four exceptions to the good-faith rule, including where the warrant affidavit is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" (ECF No. 25, at 4 (quoting *Leon*, 468 U.S. at 923).) Mr. Jiggetts asserted that the warrant underlying the search of 1120 North 21st Street was "so lacking in indicia of probable cause" because the "probable cause defect [was] the investigating officer's own statement negating the premises' residential character." (ECF No. 25, at 4.) But as identified above, the fact that 1120 North 21st Street was not Mr. Jiggetts' primary residence does not mean that the affidavit underlying the search of that property failed to support a probable cause determination. The totality of the circumstances supported the nexus established between Mr. Jiggetts' alleged drug trafficking and

30

the premises to be searched. Mr. Jiggetts therefore failed to demonstrate that the warrant underlying this search was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."[17]

Nor does the record support any other *Leon* exception. There is no indication that the judicial officers here who approved of the warrants abandoned their judicial role nor any evidence that the warrants were facially deficient in particularizing the places to be searched. The Court therefore agreed with the United States that the good-faith exception to the exclusionary rule would apply here. Even if the Court determined that the warrants were unsupported by probable cause, the Court would not order suppression.

## IV. Conclusion

For the foregoing reasons, the warrants were supported by probable cause, and even if that were not the case, the good-faith exception to the exclusionary rule would apply. The Court therefore denied the Motion, (ECF No. 20), and did not suppress the fruits of the searches at 1120 North 21st Street and 5925 Laurel Bed Lane.

Date: 6/24/26
Richmond, Virginia

/s/
M. Hannah Lauck
Chief United States District Judge

---

[17] Mr. Jiggetts further contended that that the good-faith exception did not apply because, "under [*United States v. Lull*,] an affidavit that fails to establish informant reliability except through the very activity being investigated cannot support a good-faith finding." (ECF No. 25, at 3 (citing 824 F.3d 109, 118–20 (4th Cir. 2016)).) But the Fourth Circuit's decision in *Lull* did not concern the good-faith exception. Rather, the *Lull* court determined that a warrant was not subject to the good-faith requirement because of an officer's *Franks* violation where the officer failed, among other things, to report that the person conducting the controlled purchase tried to steal a small part of the government funds provided to him. *Lull*, 824 F.3d at 112, 120. Mr. Jiggetts has withdrawn his *Franks* argument here, rendering *Lull* inapposite.